# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

MELISSA MCNAUGHTON,

                    Plaintiff

-vs-

ANDREW M. SAUL,
Commissioner of Social Security,

                    Defendant.

DECISION AND ORDER

1:18-CV-01510 CJS

_____

## APPEARANCES

For the Plaintiff:
Samantha J. Ventura
Kenneth R. Hiller
Law Offices of Kenneth R. Hiller
6000 North Bailey Avenue, Suite 1A
Amherst, New York 14226

For the Defendant:
Sixtina Fernandez
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the applications of Melissa McNaughton ("Plaintiff") for Social Security

Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.

Now before the Court is Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings

and Defendant's cross-motion (Docket No. [#10]) for the same relief. For the reasons

discussed below, Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will summarize the record only as necessary for purposes of this Decision and Order.

In 2011, Plaintiff earned her bachelor's degree in psychology from Syracuse University. (Record[1] ("R.") 46, 224, 288).

On February 26, 2012, Plaintiff was admitted to the hospital for a psychotic episode (R. 288). At the time, Plaintiff was living with her mother, who receives SSI benefits, and her sister, both of whom take mental health medications. (R. 296). Plaintiff's mother told hospital staff that Plaintiff was hallucinating and talking to the microwave oven. (R. 288, 292). On March 5, 2012, Plaintiff was discharged with diagnoses of "psychotic disorder NOS" and "anxiety disorder NOS" after being treated with Risperdal and Ativan. (R. 288–289). Plaintiff was noted as having a "similar condition" to her sister, and, like her sister, was prescribed Zyprexa. (R. 296–297)

On October 11, 2013, Plaintiff went to the hospital complaining of depression and anxiety, and asked to have her medications adjusted. (R. 309, 313). Medical staff reported only "mild" symptoms. (R. 309). A mental status examination was normal except for poor insight and judgment. (R. 311).

_____

[1] Record refers to the Transcript of the Administrative Record, July 30, 2019, Docket No. [# 7].

On February 20, 2015, Plaintiff was involved in a "low-speed sideswipe" motor vehicle accident ("MVA"). (R. 306).   Plaintiff stated that the accident occurred at approximately 5 m.p.h. (R. 330).   Plaintiff went to the hospital but was not in pain and denied hitting any part of her body during the accident. (R. 306).

Nevertheless, Plaintiff began complaining of back pain following the MVA. (R. 319). On March 4, 2015, Plaintiff had x-rays of her cervical spine and lumbar spine, both of which were "unremarkable" and negative. (R. 301, 303).

On March 4, 2015, Plaintiff began receiving chiropractic treatment, at which time she had already retained a personal injury attorney related to the MVA. (R. 329, 330).   On the chiropractic intake forms, Plaintiff indicated that her problems were "sore muscles," "memory" and "shock." (R. 327, 333).   Plaintiff also indicated that prior to the MVA she had no physical complaints, but that "since the accident" had depression, anxiety, headaches, irritability, nervousness, fatigue, photosensitivity and a stiff neck. (R. 331).

On April 19, 2015, Plaintiff had MRI testing of the lumbar spine which showed "small posterior disc bulges" at L1-L2 and L4-L5, and "mild facet arthropathy" at L5-S1. (R. 319).

On August 7, 2015, Plaintiff applied for benefits claiming a disability onset date of July 7, 2015.

On November 20, 2015, at the Commissioner's request Plaintiff had a consultative psychological examination by Janine Ippolito, Psy.D. ("Ippolito").   Plaintiff told Ippolito that she had long-standing problems with depression ("on and off for years"), general anxiety, worry and nervousness, and that she was fearful of being in large crowds of people. (R. 365).   Plaintiff indicated that she had panic attacks, characterized by "racing heart and breathing difficulties." (R. 365). Plaintiff stated that she had normal sleep. (R. 364).

Plaintiff told Ippolito that she was hospitalized twice in 2012 for anxiety and depression, and that she had spent a total of 3.5 weeks in the hospital. (R. 364). Plaintiff stated that since 2012, she had been receiving treatment and medication, which had been helpful. (R. 364). Plaintiff told Ippolito that she was unable to work due to depression and anxiety, and that she had last worked in 2015, when her employment ended due to company downsizing. (R. 364). Plaintiff also stated that she had a bulging disc in her back. (R. 364). Plaintiff further indicated that she was able to care for herself, cook, clean, do laundry, and drive a car. (R. 365). Plaintiff stated that she lived with her mother who took care of the household finances. (R. 365). Plaintiff also stated that she had friends with whom she socialized, and that she got along with her family members. (R. 365). Plaintiff told Ippolito that her interests were art, drawing, coloring, beading, watching television, and reading, and that she typically spent her days performing those activities as well as doing household chores and going for walks. (R. 365). Ippolito observed that Plaintiff was alert and oriented, with a restricted affect, neutral mood, good insight and good judgment. (R. 364–365). Ippolito's testing indicated that Plaintiff's attention, concentration and memory were intact, and that she had average intellectual functioning. (R. 365). Ippolito's diagnosis was "major depressive disorder, recurrent, moderate" and "unspecified anxiety disorder with panic attacks." (R. 367). Ippolito's prognosis was "fair" with continued treatment, and she recommended that Plaintiff pursue vocational training. (R. 367). Ippolito's medical source statement was as follows:

> The claimant presents as able to follow and understand simple directions and instructions and perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions with no

4

evidence of limitations.   She can relate adequately with others and appropriately deal with stress.   These limitations are due to her emotional distress and fatigue.

(R. 366–367).

On November 20, 2015, at the Commissioner's request Samuel Balderman, M.D., ("Balderman") performed a consultative medical examination.   Plaintiff told Balderman that for the past nine months she had been having lumbar spine pain that was intermittent, moderate and non-radiating. (R. 369).   Plaintiff indicated that medication provided partial relief for this pain.   Balderman reported that an MRI of Plaintiff's lumbar spine showed "mild disc disease." (R. 369).   Balderman noted that Plaintiff's height was 5'5" and that she weighed 275 pounds. (R. 369).   Balderman observed that Plaintiff was in no acute distress, with a normal gait and stance, but that she was only able to squat 30%. (R. 370).   Balderman's examination produced essentially normal findings, including full flexion and rotation in the lumbar spine and negative straight leg raising test bilaterally. (R. 370–71).   Balderman's neurological examination was also normal, and indicated that Plaintiff had full strength in all extremities and full dexterity and strength in her hands. (R. 371).   A mental status examination was also normal, except that Balderman noted Plaintiff's affect was "distant." (R. 371).   Balderman's diagnosis was "obesity," with a "stable" prognosis. (R. 371).   Balderman's medical source statement was as follows: "The claimant has minimal physical limitations." (R. 371).

On January 4, 2017, Plaintiff went to the emergency room ("ER"), concerning a possible concussion.   Plaintiff indicated that several weeks earlier, on December 20,

2016, she had been punched several times by a female acquaintance. (R. 429).[2] Plaintiff's mother brought her to the ER because she felt that Plaintiff's responses to questions were slower than normal. (R. 429).   Plaintiff complained of a headache (429), and the ER doctors requested a CT scan as they felt that Plaintiff likely had a concussion. (R. 431).   A CT scan of Plaintiff's head was normal. (R. 414).   A CT scan was also taken of the lumbar spine, as Plaintiff reported "low back pain after being assaulted." (R. 415). However, the scan was completely normal. (R. 415, 822, 433) ("All of the discs are normal in height and contour without bulge, herniation, spinal lateral recess or foraminal encroachment.").   Plaintiff's discharge diagnosis was post-concussion syndrome. (R.434).

On January 9, 2017, Plaintiff returned to the ER seeking treatment related to "depression, anxiety, addiction – rehab." (R. 550).   Plaintiff reported having used cocaine and marijuana. (R. 550).   An initial nursing assessment indicated the Plaintiff's behavior was "guarded," her affect/mood was "labile," she appeared "neat and clean" and her thoughts seemed "organized/goal directed." (R. 550).   However, Plaintiff was reportedly complaining of paranoia and hallucinations (R. 559), and the nursing assessment reported a "psychosis" score of 2, indicating a patient who is "guarded, suspicious, anxious, becomes confused with increasing anxiety." (R. 552).   Plaintiff was admitted to the mental health observation unit, purportedly because the ER doctor was worried that Plaintiff was intending to dwell outside in a tent in the winter weather. (R. 618) ("Pat the psych RN has discussed the case with Dr. Yatsynovich and pt is to be admitted to A2 for psych evaluation.   He is worried that she will run away and die in the freezing cold due to poor

_____

[2] Plaintiff later reported that her "friend's girlfriend" had pulled her hair and punched her in the face. (R. 406).

judgment."). In that regard, Plaintiff's mother had indicated that Plaintiff had purchased a tent and was expressing an intention to live outside. The admission note states:

> This 29 yr old female admitted to the unit under the care of Dr. Yatsynovitch with the diagnosis of "depression." Pt arrives to the unit via wheelchair accompanied by two staff members. Pt states that she recently became homeless, states that she was going to live on the reservation in a tent, denies feeling depressed, denies having any suicidal ideations presently at this time, pt affect is flat. Pt disorganized, states that she came to the [ER] "for a referral to mental health," then states "I came to get on disability so I can go back to school." Pt very vague. Pt admits to cocaine and marijuana use, states that she was involved in a domestic incident during the month of December and that she has a concussion,[3] states that she has been compliant with medication but states since domestic assault she has not been feeling the same. Pt states that she has intermittent hallucinations, slow to respond in conversation, appears to be preoccupied in thought, no acute physical distress observed. No other c/o. Denies feeling anxious presently at this time. States that she has not been sleeping well. Pt is alert, slow to respond, not oriented to situation, settled to the unit. Will continue to monitor and support pt behavior in control. Pt remains on level 3 obs.

(R. 564). The treatment plan indicated that treatment would focus on "altered thought process," "schizophrenia/acute psychosis" and "ineffective coping." (R. 558).

During Plaintiff's in-patient stay, she reportedly clarified that she had not actually been intending to live in a tent in the freezing temperatures, but that she was upset due to feeling that she was a burden on family members with whom she had been staying. (R. 586, 624). In that regard, Plaintiff and her mother had evidently been staying with a

---

[3] During Plaintiff's in-patient stay, she reportedly stated that the person who had assaulted her was her cousin (R. 586), though she had previously told a doctor that the person who attacked her was a "friend's girlfriend." (R. 406). Also during her in-patient stay, she apparently stated that during the assault she was "hit in the head and lower back," but she previously stated that she was hit only in the face, though she did complain of lower back pain. (R. 429) ("She was punched in the head multiple times. . . . She was not hit in the chest or the abdomen. She denies any neck pain. She does have some low back pain."); *see also*, (R. 625) (hit in the head).

relative due to housing issues.   Plaintiff stated that she was "depressed over housing issues" and was "upset because her father [would not] let her live with him." (R. 654). Also, during her in-patient stay, Plaintiff stated that she was planning to begin schooling in March 2017 to become a licensed practical nurse ("LPN"). (R. 655–656) ("[S]he has plans to attend school in March for LPN program she passed entrance exam and is now registered to start in March.").

On January 16, 2017, Plaintiff was discharged from the hospital. (R. 584).   The discharge diagnosis was "schizophrenia, undifferentiated, with depressive symptoms. Rule out schizoaffective disorder." (R. 586).   The discharge note explained that prior to admission Plaintiff had been "doing well" on her medications, but that she had "stopped taking her medications for unknown reasons." (R. 586–587).   The discharge report further stated that once Plaintiff's medications were re-started her condition had rapidly improved. (R. 587) ("Plaintiff responded well to her medications, and her psychotic and mood symptoms improved dramatically."). The discharge note also indicated that Plaintiff had no physical complaints, including "no back pain" and "no headaches." (R. 616).   In that regard, notes from a physical examination performed during Plaintiff's in-patient stay indicate normal neurological and musculoskeletal findings, and state that Plaintiff "walks frequently." (R. 697).

On January 23, 2017, approximately a week after she was discharged from the hospital, Plaintiff went to Talha Masood, D.O., ("Masood") requesting a referral to a "sports medicine" treatment (for her back pain) location closer to her home. (R. 403).   Masood's physical examination showed completely normal results. (R. 403).   Similarly, Masood indicated that Plaintiff's mental status was normal.   In that regard, Masood noted that

Plaintiff had been hospitalized between January 9th and January 16th, 2017, for mental health treatment, but gave no indication that Plaintiff was having any mental health problems on that day. (R. 403). Indeed, Masood expressly stated that Plaintiff had no concerns or problems other than wanting to find a physical therapist closer to her home. (R. 403).

On February 9, 2017, Plaintiff went to Masood seeking a "disability note." (R. 406). Plaintiff was "requesting disability for her back pain," but indicated that her back pain was "intermittent" and "only hurts her a few times a month." (R. 406). Plaintiff denied having any current muscle soreness or tenderness. (R. 406). Plaintiff told Masood that she was living with her mother currently, but that she hoped eventually to go to nursing school, and that "having this disability would help her financially." (R. 406). Masood noted that Plaintiff was obese, but that her physical/neurological examination was otherwise normal. (R. 407).

On February 17, 2017, Courtney Polka LMSW ("Polka") completed a report related to Plaintiff's receipt of vocational training. (R. 376–377). Polka indicated that she had been treating Plaintiff since June 1, 2016, and that Plaintiff's mental health diagnosis was "schizophrenia, undifferentiated." (R. 376). Polka stated that Plaintiff was able to work and participate in vocational training, though her ability to work was "variable." (R. 376). On that point Polka stated: "Melissa's mental health diagnosis will cause her abilities to fluctuate; there may be weeks where she cannot work at all." (R. 377). Polka further stated: "Melissa benefits from training and school work as it exercises her mind and improves her confidence. If she feels more confident, she is less likely to decompensate mentally." (R. 377).

9

On March 18, 2017, Plaintiff was a passenger in a car that went into a ditch. (R. 379).   Plaintiff did not immediately seek medical attention following this incident. (R. 379).

On May 1, 2017, Plaintiff told Masood that except for her back pain, which was "improving," she felt "good" and had no complaints. (R. 390, 391) ("She did state she's feeling good and has no current complaints at this time.").   Masood performed an examination with normal findings. (R. 390, 391) ("Physical exam was benign.").

On May 15, 2017, Plaintiff went to Masood, complaining of back pain.   Plaintiff attributed the pain to the aforementioned MVA two months earlier, on March 18, 2017. (R. 387).   Plaintiff indicated that she was taking ibuprofen and attending physical therapy, both of which were helping quite a bit. (R. 387).   Indeed, Plaintiff requested a prescription from Masood to continue physical therapy. (R. 387).   Masood performed a physical exam with completely normal results, including no swelling, deformity or tenderness along the spine, negative straight leg raising, and full strength. (R. 387).   Masood similarly reported normal mental status findings, stating, "speech clear, cognition intact, good eye contact." (R. 387). Masood referred Plaintiff for additional physical therapy and indicated, with regard to Plaintiff's employment, that she should not lift more than five pounds "until further notice." (R. 388).

On April 3, 2017, Plaintiff went to Masood, stating that her back was still sore from an MVA on March 18, 2017. (R. 400).   Plaintiff provided additional information about the MVA, stating that her boyfriend had driven into a ditch. (R. 400). Plaintiff further stated that she had been wearing a seatbelt, that the airbags had not deployed, and that there had been no damage to the car. (R. 400).   Still, Plaintiff stated that the incident had

exacerbated her back pain, resulting in soreness in her upper back and lower back. (R. 400). Plaintiff also stated that "standing for long periods of time and lifting heavy objects" made the pain worse. (R. 400). (Plaintiff was employed at that time as a cashier at Tops Supermarket. (R. 400)). Masood observed that Plaintiff appeared well, alert, oriented and in no distress. (R. 400). Masood reported that Plaintiff was obese, but that otherwise his examination of her was unremarkable, including no spinal pain on palpation, and negative straight leg raising bilaterally. (R. 400-401). Apparently in response to Plaintiff's repeated request that Masood certify her as being disabled, Masood wrote: "Will not grant her disability at this time. She has lost weight and is doing well medically. On physical exam, she had entirely negative exam except for obesity, which has been improving. Will get an x-ray and send to physical therapy for evaluation." (R. 401).

On April 10, 2017, Plaintiff went to Masood for an annual depression screening. (R. 396). On her depression test, Plaintiff scored zero, indicating that she was not having depression symptoms. (R. 396). Plaintiff also indicated that she was working and had recently completed two 8-hour shifts. (R. 396).

On April 17, 2017, Plaintiff returned to see Masood, requesting a note limiting her to light duty at work. (R. 393). Plaintiff stated that her back was still sore, from the MVA in March and from lifting heavy objects at work. (R. 393). Plaintiff reported headaches and pain radiating into her legs, and stated that ibuprofen and chiropractic treatments were giving her some relief. (R. 393). Again, though, apart from Plaintiff's obesity, Masood's physical examination was completely normal. (R. 394). Nevertheless, Masood gave Plaintiff another note limiting her to lifting no more than five pounds "until further notice" and referred her for x-ray. (R. 394). That same day, x-rays were taken of Plaintiff's

cervical, thoracic and lumbar spines. The x-ray of her cervical spine was "unremarkable." (R. 411). The thoracic x-ray showed "mild disc space narrowing at all mid levels," but was otherwise "unremarkable." (R. 412). The lumbar-spine x-ray was normal. (R. 413) ("Normal lumbosacral spine unchanged from 3/4/15.").

On May 1, 2017, Plaintiff returned to Masood, stating that she felt good and had no complaints. (R. 390). Masood reported that his physical examination of Plaintiff was "benign" and that her pack pain was "improving." (R. 391).

On May 10, 2017, Plaintiff's physical therapist, Katelyn Pellegrino DPT ("Pellegrino"), indicated that Plaintiff was being discharged from treatment because treatment had been successful: "Patient has progressed well in physical therapy. She demonstrates no limitations in lumbar spine ROM or c/o functional limitations." (R. 991).

On May 15, 2017, Plaintiff saw Masood for a follow-up visit related to her back pain. (R. 387). Plaintiff stated that physical therapy had been helping her "significantly" and that she was "increasing her functionality." (R. 387). Masood's physical examination was normal, but he continued Plaintiff's 5-pound lifting restriction "until further notice." (R. 387–388).

On June 2, 2017, Plaintiff went to Sanjana Iddyadinesh, M.D. ("Iddyadinesh"), a physician in the same office as Masood, complaining of bumps on her skin. (R. 383). Iddyadinesh reported that Plaintiff had no other complaints or concerns, and in particular, "no depression, no anxiety." (R. 383). Plaintiff reported that she was currently employed, and that for exercise she walked twenty minutes each day and occasionally lifted weights. (R. 384). Iddyadinesh performed an examination with normal results, including no swelling, deformity or tenderness to palpation along the spine. (R. 385).

On August 2, 2017, Plaintiff returned to Masood, complaining of pain in her upper and lower back. (R. 379).   Plaintiff stated that one month earlier she had pulled a muscle in her back, which limited her motion. (R. 379).   Plaintiff requested another referral to physical therapy. (R. 379).   Plaintiff told Masood that she was taking a variety of medications which gave her no negative side effects. (R. 381).   Masood performed a physical examination and reported that Plaintiff was alert and oriented and in no apparent distress; that she had no swelling, deformity or to palpation along the spine or in the paraspinal region; that she had intact range of movement; full muscle strength; and negative straight leg raising tests bilaterally. (R. 380). Masood also reported a normal mental status exam. (R. 380).   Masood spoke to Plaintiff about her need to lose weight, and Plaintiff indicated that "she exercise[d] on the elliptical daily for 30 minutes along with lifting weights." (R. 381).   Masood's diagnosis was "back pain," and he stated: "Back pain is likely from obesity + muscle spasm.   She does not appear to be a candidate for disability." (R. 381).

After the Commissioner denied Plaintiff's claim initially, on February 1, 2018, a hearing was held before an Administrative Law Judge ("ALJ"), at which there was testimony from Plaintiff and a vocational expert ("VE").   At the time of the hearing, Plaintiff was thirty years of age, and, as mentioned earlier, had earned a bachelor's degree in psychology. (R. 46, 224, 288).   After graduation from college, Plaintiff first worked for a year as an "outreach worker," which was similar to a social worker. (R. 46).   During 2012 and 2013, Plaintiff worked at the Seneca Niagara Casino as a desk clerk and income auditor. (R. 46).   In 2016, after the alleged disability onset date, Plaintiff worked part-time as a telemarketer (R. 47), as a cashier and bakery associate at Tops Supermarket

(R. 48),[4] and as a personal care aide for a nursing agency. (R. 48). After leaving her job at Tops, Plaintiff received unemployment benefits from May 2017 through October 2017. (R. 45) (In this action Plaintiff is claiming disability as of July 2015). As mentioned earlier, the record indicates that Plaintiff had enrolled in classes to become an LPN beginning in March 2017, but there was no testimony about that at the hearing.

In any event, Plaintiff testified at the hearing that she has constant back pain which gets worse if she carries anything weighing more than a few pounds. Plaintiff also stated that her back begins to hurt if she sits for longer than twenty minutes (R. 66), or if she stands for longer than fifteen minutes. (R. 67). Plaintiff indicated that she treats her back pain with over-the-counter analgesics, chiropractic treatments and physical therapy, and that no doctor has recommended that she have surgery. (R. 50–51). Regarding her mental health, Plaintiff stated that she has weekly spells of depression that last for several hours, during which she does not want to get out of bed or do anything. (R. 52). Plaintiff also indicated that she has attacks of anxiety and panic during which she feels nauseous and short of breath, and that these attacks occur about one per month and last anywhere from a few minutes to an hour. (R. 52–53). Plaintiff stated that she hears voices "maybe like once a day." (R. 75). Plaintiff stated that in October 2017 she went to an emergency room for an anxiety attack but was not admitted. (R. 57). Plaintiff further stated that she feels nervous interacting with people. (R. 53). Plaintiff asserted that she has had problems with her bosses, since it stresses her out to have someone telling her what to do

---

[4] Regarding her employment at Tops, Plaintiff stated at the hearing that "one of the reasons" that she lost her job at Tops was because she injured her back and Tops had no light duty jobs available. (R. 70). However, paperwork from Tops indicates that Plaintiff gave her notice because she was moving. (R. 218).

all of the time. (R. 54).   Plaintiff also indicated that she is "not really" able to follow spoken instructions very well, and that she does better with written instructions. (R. 54). (Although, when Plaintiff applied for benefits, she indicated that she could follow both oral and written instructions, and that she did not have problems with "bosses" or other people in authority. (R. 257)).

Plaintiff testified that she continues to live with her mother, and that while she is able to care for herself, her mother does most of the household chores. (R. 58–60). Plaintiff indicated, though, that she cooks dinner every day. (R. 254). Plaintiff indicated that prior to 2012, she lived by herself and cared for her own needs but that in 2012 she began taking medication and decided that she needed someone to take care of her.[5] (R. 63). Plaintiff stated that now she is unable to go out in public without her mother. (R. 74). (Although, when Plaintiff applied for benefits, she indicated that she was able to go out by herself, and that she went to the library, sporting events and social groups "every day." (R. 253–254)).   Plaintiff indicated that she smokes a few cigarettes per day (R. 62), and that her hobbies are painting, artwork, beadwork, sports, reading, watching television and Facebook. (R. 61).   Despite having attended and completed college, where she reportedly worked as an academic tutor and literacy volunteer (R. 224), and despite telling her doctors that she intended to attend nursing school in 2017, Plaintiff told the ALJ that it would be difficult for her to learn new things because she would need a coach to help her. (R. 72).

---

[5] This statement is not consistent with the Record, which indicates that when Plaintiff first began having mental health problems in 2012, she was already living with her mother.

On April 17, 2018, the ALJ issued a decision denying Plaintiff's applications. (R. 10–24). Following the familiar five-step sequential evaluation process for disability claims, the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged disability onset date; that Plaintiff had severe impairments consisting of "lumbar degenerative disc disease, obesity, schizophrenia with depressive disorder, and anxiety with panic attacks"; and that none of those impairments by themselves or together met or medically equaled a listed impairment.[6] (R. 12–13).

Prior to reaching the fourth step of the sequential evaluation, the ALJ found that despite Plaintiff's impairments she had the following residual functional capacity ("RFC") to perform less than a full range of light work:

> [C]laimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant requires changing positions from sitting to standing during the 8-hour workday while remaining on task. The claimant can sit for 45 minutes before having to shift positions and can stand for up to 30 minutes before she needs to sit all while remaining on task. The claimant can frequently climb ramps and stairs and occasionally balance on level surfaces, stoop (i.e bending at the waist), kneel and crouch (i.e. bending at the knees) but never crawl. The claimant can never tolerate exposure to unprotected heights, moving machinery and moving mechanical parts. The claimant is able to understand, carry out, and remember simple, routine and repetitive tasks defined as work that requires doing the same tasks every day with little variation in location, hours or tasks. The claimant can perform work in a low stress environment (meaning one with no supervisory responsibilities; no work at production rate pace and no fast-moving assembly line-type work; and with few, if any, work place changes in work routines, processes or settings). The claimant can perform work that would not require a high level of attention to detail. Written instructions are the preferred method to receive instructions. The claimant can perform work that is subject to no more than occasional supervision and work that does not require travel to unfamiliar places. The claimant can have occasional

_____

[6] At the hearing, Plaintiff admitted that her impairments did not meet or medically equal a listing. (R. 44).

contact and interaction with supervisors, co-workers and the public.

(16).   In support of this RFC determination, the ALJ summarized Plaintiff's statements about her symptoms and limitations and found that they were not entirely consistent with the evidence.   For example, the ALJ found that Plaintiff's statements about her symptoms were inconsistent with her statements about her daily activities, including the fact that she was able to work part-time during the relevant period, even though such work did not rise to the level of SGA. (R. 18).   The ALJ further noted that Plaintiff received unemployment benefits[7] during the relevant period. (R. 18).   Additionally, the ALJ observed that Plaintiff was non-compliant with treatment recommendations at various times, such as by failing to attend appointments and failing to take medications, which the ALJ found indicated that Plaintiff's "symptoms [were] not as severe as she [claimed]." (R. 18).

The ALJ further concluded that the "objective medical evidence" indicated that Plaintiff's functional limitations were not as great as she claimed.   For example, with regard to physical impairments, the ALJ indicated that some postural and environmental limitations were appropriate due to "claimant's degenerative disc disease of the lumbar spine." (R. 19).   However, the ALJ observed that MRI testing of Plaintiff's lumbar spine had revealed only "mild findings," for which Plaintiff had received only "conservative treatment modalities" such as chiropractic manipulation and physical therapy. (R. 19). Additionally, the ALJ indicated that physical examinations of Plaintiff had revealed "normal musculoskeletal findings" "including normal strength, gait, coordination and negative straight leg raises." (R. 19).   The ALJ also noted that Plaintiff had told doctors that she

---

[7] Despite claiming disability beginning July 7, 2015, Plaintiff received unemployment benefits from May 2017 through October 2017. (R. 45).

had only "intermittent back pain" and was "able to walk frequently and exercise on the elliptical [machine] daily." (R. 19). As for Plaintiff's mental impairments, the ALJ stated that Plaintiff had received only "limited, routine and conservative treatment for her depression, anxiety and schizoaffective disorder." (R. 19). The ALJ acknowledged that in March 2012, prior to the alleged disability onset date, Plaintiff had been hospitalized for "acute psychosis" (R. 19) and that she similarly been hospitalized in 2017 due to psychosis and depressive symptoms. (R. 20). However, the ALJ stated that overall Plaintiff "has good stability when on psychotropic medication with improvement in mental status findings." (R. 20).

The ALJ also reviewed the medical opinion evidence and explained the weight that she assigned to the various opinions "in accordance with the criteria of 20 CFR 404.1527 and 416.927." (R. 20). The ALJ gave "partial weight" to Ippolito's 2015 consultative psychological assessment, stating that it was "generally consistent with the treatment records" and the "grossly normal mental status findings upon examination," but that it failed to adequately consider Plaintiff's "anxiety symptoms" and their effect on her ability to interact socially and handle stress. (R. 20). Similarly, the ALJ gave "partial weight" to the 2017 opinion of Plaintiff's counselor, Polka, finding that it was largely "consistent with the claimant's longitudinal treatment record, work activity and conservative treatment measures." (R. 21). However, the ALJ noted that Polka was not an acceptable medical source, and stated that some of the limitations which she had identified were "inconsistent with the improvements noted in the record, including stability with psychotropic medication." (R. 21). The ALJ assigned "great weight" to Balderman's 2015 consultative medical assessment, finding that it was "consistent with the longitudinal treatment record,"

18

which showed that despite Plaintiff's "reported back pain and mild degenerative disc disease" Plaintiff was "capable of engaging in activities of daily living and work activity consistent with a reduced range of light physical exertion." (R. 21).   However, the ALJ gave only "little weight" to the opinions of Plaintiff's chiropractor and physical therapist, respectively, finding that in addition to being "other source" opinions they were "vague" and "rendered with the intent to be temporary, during the regular course of recovery, and [were therefore] not an accurate depiction of Plaintiff's overall abilities to function." (R. 21).

Overall, the ALJ stated that it was appropriate to limit Plaintiff to light work with postural limitations since Plaintiff's "allegations regarding difficulty walking and standing" were supported by the record. (R. 22).   Additionally, the ALJ stated that the non-exertional limitations in the RFC were appropriate "given the claimant's moderate difficulties in understanding, remembering and applying information[,] interacting with others [and] concentrating, as well as [her] mild difficulties in persisting and maintaining pace and adapting and managing [herself.]." (R. 22). However, the ALJ stated that any additional RFC limitations would not be justified by the record.

At step four of the sequential evaluation the ALJ found that Plaintiff was unable to perform any past relevant work. (R. 22).   However, at the fifth and final step of the sequential evaluation the ALJ found, based on testimony from a vocational expert ("VE") that Plaintiff could still perform other jobs with the RFC set forth above, namely, the jobs of "cleaner," "garment sorter" and "warehouse support worker." (R. 23).   Consequently, the ALJ denied Plaintiff's applications, finding that she was not under a disability at any relevant time. (R. 24).   The Appeals Council subsequently denied Plaintiff's request for review.

On December 27, 2018, Plaintiff commenced this action.    On September 30, 2019,

Plaintiff filed the subject motion [#9] for judgment on the pleadings, and on October 30,

2019, Defendant filed the subject cross-motion [#10] for the same relief.    The arguments

of the parties are set forth below.    The Court has considered the record and the parties'

submissions.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner

of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by this Court is whether the Commissioner's conclusions "are

supported by substantial evidence in the record as a whole or are based on an erroneous

legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).    Substantial evidence

is defined as "more than a mere scintilla.    It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—
> even more so than the 'clearly erroneous' standard, and the Commissioner's
> findings of fact must be upheld unless a reasonable factfinder would have to
> conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443,
> 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not
> required to discuss every piece of evidence submitted, and the failure to cite
> specific evidence does not indicate that such evidence was not considered.
> *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019)

(internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See,*

*Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's

weighing of the evidence, but the deferential standard of review prevents us from

20

reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

<u>The ALJ Did Not Err by Relying on Stale Medical Opinions</u>

Plaintiff maintains that "[t]he ALJ improperly depended upon the stale opinions of Dr. Balderman and Dr. Ippolito."[8]   On this point, Plaintiff indicates that consultative opinions are generally entitled to little weight, and that stale medical opinions cannot constitute substantial evidence to support an RFC determination.   Plaintiff contends that Balderman's consultative opinion was stale because it was rendered in 2015, while Plaintiff subsequently had an MVA in 2017 and then saw a chiropractor numerous times.   Plaintiff similarly maintains that Ippolito's consultative opinion was stale because it too was rendered in 2015, prior to Plaintiff's 2017 in-patient treatment and diagnoses of "psychotic disorder and schizoaffective disorder."[9]   The Court disagrees.

Reversal may be appropriate where the Commissioner's decision to deny benefits rests on a consultative opinion that was "stale" because it was rendered on an incomplete record, particularly where subsequent developments in the medical evidence cast doubt on the accuracy of the opinion:

> In *Hidalgo v. Bowen*, under the regulations then in effect, the Second Circuit rejected an ALJ's decision that relied exclusively on the opinion of a non-examining consultant, in part because the non-examining physician reviewed a limited record

---

[8]  Pl. Memo of Law [#9-1] at p. 1.
[9]  Pl. Memo of Law [#9-1] at p. 11.

that did not include subsequent clinical findings, such as clinical notes of a treating physician and hospital records including X-rays. 822 F.2d 294, 295–96, 298 (2d Cir. 1987). Because this subsequent evidence "confirmed" the RFC determination of the primary treating physician and "may have altered [the non-examining consultant's] conclusions," the Second Circuit remanded to the ALJ. *Id.* at 298. But in *Camille v. Colvin*, the Second Circuit reached the opposite conclusion in a non-precedential opinion, rejecting an argument that a non-examining source was "stale" solely because a non-examining source did not review later submitted evidence where "th[at] additional evidence does not raise doubts as to the reliability of [the non-examining source's] opinion." 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (distinguishing *Hidalgo*, 822 F.2d at 295–96, 298) ). In that case, because the later opinion evidence did not differ materially from the opinions that the non-examining physician did consider, the Second Circuit found that the ALJ committed no error by relying on the non-examining physician. *Id.*

*West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (footnote omitted).   Reversal may be particularly appropriate where the Commissioner relied heavily on the stale opinion in formulating the claimant's RFC, and no other medical opinion supports the RFC. *See, Id.* at *6 ("Because the ALJ placed 'great weight' on Dr. Kuslis' [stale] opinion in formulating the RFC, and because no other medical opinion cited by the ALJ fully supported the RFC, remand is warranted.").

In the instant case, however, the evidence as summarized above indicates that there was no significant change in Plaintiff's physical condition or mental condition after Ippolito and Balderman rendered their decisions.   Moreover, after Ippolito and Balderman issued their opinions, various treating doctors consistently reported negative/benign findings that were consistent with the opinions of Balderman and Ippolito.   Indeed, the Record does not suggest that Plaintiff was disabled at *any* time.[10]

_____

[10] Moreover, as already mentioned, the Record contains multiple statements by Plaintiff indicating that she wanted to obtain disability benefits so that she could afford to attend nursing school. (R. 406, 564, 655–56).

The medical evidence both before and after Balderman rendered his opinion indicated that any problem with Plaintiff's back was mild at best. Additionally, the results of physical examinations performed after Balderman's opinion was written were consistently benign. Moreover, contrary to what Plaintiff suggests, and regardless of particular diagnostic terminology, Plaintiff's mental health hospitalizations in 2017 were not the result of a worsening in her condition and did not result in any new mental limitations. When Ippolito rendered her opinion, she expressly referenced the fact that Plaintiff had two prior hospitalizations for depression and anxiety. Plaintiff's subsequent hospitalizations in 2017 were not due to any worsening of her condition. The first was due to a possible concussion, and the second was due to the fact that Plaintiff had stopped taking her prescribed medications (and instead used cocaine and marijuana). Furthermore, immediately after Plaintiff was discharged from the hospital, she resumed working and her doctors resumed reporting normal mental health findings. Consequently, Plaintiff's contention that the ALJ relied on stale consultative opinions lacks merit.

<u>The RFC Determination is Supported by Substantial Evidence</u>

Plaintiff also maintains that the ALJ impermissibly substituted her own opinion for competent medical opinion when fashioning her RFC determination. In this regard, Plaintiff contends that the ALJ necessarily relied on her own medical judgment because the only two medical opinions in the record (by Ippolito and Balderman) were stale. However, the Court has already explained that Plaintiff's argument on that point lacks merit.

Plaintiff alternatively contends that the ALJ must have relied on her own medical judgment to make the RFC finding, since the opinions by Ippolito and Balderman are too

vague to support the ALJ's "remarkably specific" RFC determination.[11]   The Court again

disagrees.

The RFC finding is consistent with Ippolito's opinion insofar as it limits Plaintiff to

simple work.   Although the ALJ included additional non-exertional limitations, she gave a

very detailed explanation for why she did so. (R. 16–22).   For example, to the extent that

the ALJ included limitations, on Plaintiff's ability to interact with people or to take oral

instruction, that did not appear in Ippolito's opinion, it was because she credited Plaintiff's

statements about those matters.   The ALJ did not err in that regard, since an ALJ is

entitled to make an RFC finding that is consistent with the record as a whole, even if it

does not perfectly match a particular medical opinion. *See*, *Matta v. Astrue*, 508 F. App'x

53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical

judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly

correspond with any of the opinions of medical sources cited in his decision, he was

entitled to weigh all of the evidence available to make an RFC finding that was consistent

with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir.

2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated

additional limitations based on*, inter alia*, the testimony of Camille that she credited. An

ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

Similarly, the ALJ did not err by including physical RFC limitations that exceeded

those identified by Balderman.   In that regard, as mentioned earlier Balderman concluded

---

[11]  The Court recognizes that it may constitute error for an ALJ to rely on a medical opinion that is so vague
that the ALJ is forced to rely "sheer speculation" in deriving specific functional findings from it. *See, e.g.,*
*Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).

that Plaintiff had only "minimal physical limitations." (R. 371). That statement is not vague in light of Balderman's entire report, which referenced Plaintiff's MRI test showing only "mild disc disease" (R. 369), and which reported completely normal physical examination findings, except for a limited ability to squat. In any event, the ALJ interpreted Balderman's opinion as being consistent with "a reduced range of light physical exertion." (R. 21). To the extent that the ALJ included limitations that were not expressly contained in Balderman's report, such as the need for Plaintiff to change position periodically, the limitations were based on Plaintiff's statements. The ALJ did not err in that regard. *See*, *Camille v. Colvin*, 652 F. App'x at 29 n. 5 ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on*, inter alia*, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings [#9] is denied, Defendant's cross-motion [#10] for the same relief is granted, and this matter is dismissed. The Clerk of the Court is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York
     March 30, 2020

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge